**Opinion issued November 15, 2016**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-16-00445-CV

—————————————

## IN THE INTEREST OF J.L.M., K.A.S., B.B.S., AND A.L.S., MINOR CHILDREN

---

On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Case No. 75684-F

---

## MEMORANDUM OPINION

C.B. appeals from the trial court's judgment terminating her parental rights to her four children, J.L.M., K.A.S., B.B.S., and A.L.S. In four issues, C.B. contends that (1) the trial court erred in continuing the trial proceedings after the monitored return of her children failed instead of beginning a new trial, and in considering

evidence presented prior to the date of the monitored return order; (2) the evidence is legally and factually insufficient to support the trial court's termination findings under Family Code section 161.001(b)(1)(D); (3) the evidence is legally and factually insufficient to support the trial court's termination findings under section 161.001(b)(1)(E); and (4) the evidence is legally and factually insufficient to support a finding that termination of C.B.'s parental rights is in the children's best interest. We affirm.

## Background

On March 8, 2013, the Department of Family and Protective Services began an investigation into allegations of neglectful supervision, physical abuse, and medical neglect of J.L.M. (nine years old), K.A.S. (three years old), A.L.S., and B.B.S. (two-year old twins). J.L.M., who was found with belt marks on the back and front of her leg, described seeing her mother's live-in boyfriend, Edward Wiley, drag her mother by her feet. The incident resulted in a domestic disturbance call to police. The Department learned from J.L.M.'s school that J.L.M. was missing as many as two days of school every week. K.A.S., who was staying with his great-grandmother at the time, was found unsupervised outside by police.

In June 2013, Susan Gonzales, a Department caseworker, completed a family-based safety services assessment of C.B. in which she noted the following concerns: over-discipline of J.L.M., a history of substance abuse with no treatment

2

completed, multiple caregivers for the children, and a history of family violence. After detecting the smell of marijuana during a home visit on July 9, 2013, Gonzales asked C.B. to submit to a urinalysis but C.B. failed to show up for the scheduled test.

After several failed attempts to locate C.B. in August 2013, the Department conducted a home visit on August 28 at the home of C.B.'s great-grandmother. C.B. told Tyshawndalon Eaton, the assigned caseworker, that she was no longer in a relationship with Wiley and refused to sign the safety plan and family plan of service.

On September 17, 2013, Eaton learned that J.L.M.'s school continued to be concerned about her attendance. When Eaton attempted to conduct a home visit on October 8, 2013 at the home of C.B.'s great-grandmother, she was told that C.B. was unavailable and that the children were staying with an aunt in a different city.

On October 20, 2013, C.B. and Wiley were arrested for assault and released the following day with time served. On October 24, 2013, C.B. signed the family plan and agreed to participate in services. On October 31, 2013, due to her recent arrest and noncompliance with services, C.B. agreed to place all four children with her maternal aunt. However, during a meeting on December 6, 2013, C.B.'s aunt told Eaton that she could no longer care for C.B.'s children because C.B. was disrespectful toward her and that C.B. preferred to be with Wiley rather than with her children. C.B. told Eaton that she was willing to participate in services while living with Wiley.

On January 2, 2014, Eaton learned from police that C.B. and Wiley were involved in a family violence altercation in which C.B. sustained visible facial injuries, and that K.A.S was present during the incident. On January 7, 2014, the Department attempted to conduct a family team meeting to secure a safe placement for the children in light of the recent episode of family violence and to engage the family in services. C.B. failed to show up for the meeting and informed a Department representative that she preferred the children to enter foster care because "they needed a vacation." A.L.S. and B.B.S. were placed with an aunt and J.L.M. and K.A.S. were placed with a maternal grandmother. At 11:45 p.m., C.B. arrived at the Department offices accompanied by Wiley, apologized for missing the meeting, and agreed to the Department's safety plan. She also took a drug test and tested negative.

On January 8, 2014, C.B. told Eaton that she had decided not to participate in services. On January 13, 2014, C.B. told Eaton that she no longer wanted the children placed with the aunt and that she wanted them moved to the home of another relative immediately. She told Eaton that although she was aware of her aunt's bond with A.L.S. and B.B.S., it was time for the bond to be "broken" because "they were turning her kids against her." During the call, C.B. became very upset and belligerent toward Eaton and threatened her. On January 14, 2014, C.B. told Eaton

4

that she was no longer in a relationship with Wiley. The next day, C.B. took the children to stay in the home of a family friend.

On January 27, 2014, the Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. In its petition, the Department requested that the trial court set a hearing to determine temporary managing conservatorship of J.L.M., K.A.S., B.B.S., and A.L.S. based on neglectful supervision. In her supporting affidavit, Eaton cited C.B.'s refusal to engage in services; her placement of the children with several relatives who the Department determined to be inappropriate placements; her disruptive behavior toward the placements; her failure to appear for a drug test; her failure to initiate parenting classes or therapy; her constant movement between three counties; the domestic violence in her relationship with Wiley; and her arrest for assault. On February 6, 2014, C.B. tested positive for synthetic marijuana.

On February 13, 2014, the trial court held a show cause hearing and appointed the Department temporary managing conservator of the children. In its order, the court set a trial date of January 15, 2015 and a dismissal date of February 9, 2015.

Trial began on January 15, 2015. Upon the Department's and court-appointed ad litem's request, the court continued the proceeding until February 5, 2015. On February 5, Sharon McNair, the Department supervisor assigned to the case, testified

5

that the Department's goal was permanent managing conservatorship to relatives. She stated that it was in the best interest of J.L.M., A.L.S., and B.B.S. to remain with their current caregivers, and requested that the Department be granted conservatorship of K.A.S. while it continued to work with C.B. to determine whether he could be returned to her because no other relative was available or willing to take him while C.B. remained involved in his life. The trial court decided to carry the issue and the case was continued.

When trial resumed on June 18, 2015, McNair testified that the Department's recommendation had changed from permanent managing conservatorship to relatives to termination of C.B. parental rights due to several developments in the intervening months. McNair testified that during a family visit on February 27, 2015, the children became visibly upset when C.B. began cursing at McNair and told the children not to leave with McNair and to return home with her instead. On March 29, 2015, during another family visit, C.B. began screaming and cursing. Police were called to intervene on both occasions. McNair stated that C.B. threatened and was verbally abusive to her therapists, a Department caseworker, and the relative placements, and that C.B. was unsuccessfully discharged twice from individual therapy. McNair testified that C.B. had not provided a safe and stable home for the children, and that the children had an unhealthy fear of C.B.

6

On-cross examination, McNair testified that C.B. attended counseling, was seen by a psychologist and psychiatrist, attended some parenting classes, and had refrained from criminal activity since 2013. However, McNair also testified that C.B. had not maintained a safe and stable home for the children, that she tested positive for synthetic marijuana on one occasion, and did not show up for drug testing on three occasions.

The trial resumed on August 7, 2015. Dr. Wafaa Faraq, a psychiatrist, testified that he evaluated C.B. on May 6, 2015. Based on his evaluation, Dr. Faraq testified that he had concerns about C.B.'s volatility and her denial of prior drug use and that those issues would affect her ability to parent. He further testified that he had significant concern about C.B.'s lack of insight into her behavior, stating that "the big problem is that she didn't acknowledge that she has any problem; and thus, you can't treat her." Dr. Faraq testified that, based on his evaluation, he did not believe that it was in the children's best interest to be returned to C.B.

C.B. admitted that she had used a belt to discipline J.L.M. and that she and Wiley were involved in a domestic violence incident in 2013 at which K.A.S. was present. She acknowledged that she did not successfully complete therapy but was unsure why. C.B. testified that she had left verbally abusive voice mail messages for her therapist and that she "got into it" with her therapist, and that they "got into cuss-out fight[s]" on more than one occasion. C.B. testified that she called the police

7

once during a family visit with her children because she was having a verbal altercation with McNair and McNair pushed her.

At the conclusion of the testimony, pursuant to an agreement between the parties, the trial court ordered a monitored return of the children to C.B. (with staggered return dates), and that the Department monitor their return and report on their progress. The court also set a new dismissal date of February 11, 2016. On September 18, 2015, the trial court signed the monitored return order which provided, among other things, that the Department would continue as temporary managing conservator and was authorized to remove the children if it became apparent that C.B.'s home was no longer a safe environment before the monitoring period ended.

On January 20, 2016, the Department filed an Emergency Petition to Modify Temporary Order seeking removal of the children.[1] The Department attached McNair's supporting affidavit to the petition.[2] At a hearing, McNair testified that, on January 15, 2016, C.B. told her that she believed the twins had been sexually molested by a relative of the foster caregiver with whom the twins had been placed

---

[1]   A.L.S., B.B.S., and K.A.S. had already returned to C.B. under the monitored return order, and J.L.M. was scheduled to return that day.

[2]   In her affidavit, McNair noted C.B.'s prior criminal history which included eight convictions between 2005 and 2010 for various offenses including criminal trespass, theft, and resisting arrest.

prior to their return, and that J.L.M. had sexually molested one of the twins. On January 16, J.L.M. told McNair that C.B. had called her the night before and threatened to kill her, telling her that if she did not report the alleged sexual abuse of the twins, C.B. was going to "put something in her drink and kill [her]" and put a gun in J.L.M.'s mouth. McNair testified that an investigation of the molestation allegations ruled them out. McNair testified that, based on these developments, the Department decided not to return J.L.M. to C.B. McNair also testified that, on January 16, C.B. left a voice mail message for her in which C.B. could be heard coaching K.A.S. in question-and-answer format to say that McNair had told K.A.S. "to run away from his mama, to run out into the middle of road so that he could get run over and kill himself." McNair stated that K.A.S. was distraught and crying on the recording. McNair also testified that K.A.S. asked her to return him to foster care. Based on these developments, the Department decided to remove A.L.S., B.B.S., and K.A.S. from C.B.'s home. At the close of the hearing, the trial court ordered that there be no contact between C.B. and the children.

When trial resumed on April 14, 2016,[3] McNair testified that when she attempted to address J.L.M.'s statement that C.B. had threatened to kill her and K.A.S.'s coached phone call, C.B. threw her cell phone at McNair's head, shoved

---

[3] On February 11, 2016, the trial court heard C.B.'s attorney's motion to withdraw and the Department's motion to surrender necessities.

her, and spat on her. McNair testified that K.A.S. had tried to run away three times after being returned to C.B. under the monitored return order. McNair also testified that, in an effort make the monitored return successful, the Department provided transportation for the children to attend medical appointments and helped C.B. enroll K.A.S. in school, as well as secured county funds (in addition to the personal funds contributed by McNair and another Department caseworker) to purchase a hot water heater for C.B.'s home.

McNair testified that after the children were returned to C.B.'s home, McNair discovered that Wiley was living in C.B.'s home. She also testified that C.B. failed to abide by the terms of the monitored return order by not attending parenting classes. McNair also testified that in the intervening period between the children's return to C.B.'s home and their removal in January 2016, C.B. had frequent outbursts in her interactions with Department personnel—on phone calls, in text messages, and in person during visits with her children—including one involving a foster parent.[4] On November 13, 2015, when C.B. was arrested for outstanding warrants, McNair picked up the children from jail and arranged for them to spend the weekend with their grandmother until C.B. returned home.

---

[4] At the end of a visit with her children, C.B. verbally attacked a Department employee calling her a "crackhead," and C.B. had to be escorted out of the building by security. McNair testified that when she escorted the children and foster parent outside afterwards, C.B. began screaming at the foster parent, called her a "crackhead," and threatened to track her down.

McNair testified that the Department was seeking termination of C.B.'s parental rights to her four children under grounds D, E, and O of Chapter 161.001 of the Family Code due to ongoing emotional neglect, both before and during the monitored return, an unstable home environment, and C.B.'s complete unwillingness or inability to supervise her children, and that termination would be in the children's best interest. McNair testified that J.L.M. was currently placed with her paternal grandmother who is providing a stable environment for her, and that J.L.M. is thriving and doing well in school. McNair testified that the Department's recommendation was to grant J.L.M.'s grandmother permanent managing conservatorship of J.L.M. She further testified that A.L.S., B.B.S., and K.A.S. were doing very well in their foster placements and that their physical, emotional, and educational needs were being met.

C.B. testified that the phone call made to McNair with K.A.S. was an unintended "butt dial" but later stated that she intentionally made the call to McNair. C.B. further testified that J.L.M. lied when she told McNair that C.B. had threatened to kill her. C.B. denied any involvement with her ex-boyfriend, Wiley. With regard to McNair's testimony that she saw Wiley at C.B.'s house during the monitored return, C.B. testified that she did not know whether Wiley was there because she was not at home. C.B. testified that she took some parenting classes, she has tested negative on her drug tests since February 2014, and that she has not whipped J.L.M.

with a belt since the 2013 incident. She stated that if the children were returned to her, they would live in a family-owned three-bedroom property rent-free. C.B. testified that she had worked overnight shifts at Jack-in-the-Box for a month but quit when the children were returned to her because she did not have overnight childcare. She subsequently provided in-home healthcare for a neighbor for four hours a day and earned $10 an hour but stated that her client was in the hospital at the time of trial and she did not have any other clients. C.B. testified that K.A.S tried to run away from school and told her that McNair had given him $10 and told him to run away. C.B. also testified that when J.L.M. did not abide by her 11:00 p.m. curfew, she called police for assistance.

At the conclusion of trial, the trial court found that termination of the parent-child relationship was warranted under subsections (D) and (E), and that termination was in the children's best interest. The trial court signed its termination order on May 16, 2016. This appeal followed.

### Compliance with Family Code Sections 263.401 and 263.403

In her first issue, C.B. contends that the trial court erred in continuing the trial proceedings after the monitored return of her children had failed instead of beginning a new trial and in considering evidence presented prior to the date of the monitored return order.

12

## A. Applicable Law

Family Code section 263.401(a) requires the dismissal of a suit affecting the parent-child relationship ("SAPCR") filed by the Department requesting the termination of parental rights or requesting that the Department be named managing conservator on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1). *See* Tex. FAM. CODE ANN. § 263.401(a) (West Supp. 2016). Subsection (b) provides that "[u]nless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *See id*. at §263.401(b). In that case, "the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a)." *See id*.

Section 263.403(a) provides that "[n]otwithstanding Section 263.401, the court may retain jurisdiction and not dismiss the suit or render a final order as required by that section if the court renders a temporary order that: (1) finds that

13

retaining jurisdiction under this section is in the best interest of the child; (2) orders the department to return the child to the child's parent; (3) orders the department to continue to serve as temporary managing conservator of the child; and (4) orders the department to monitor the child's placement to ensure that the child is in a safe environment." *Id.* at § 263.403(a). If the court renders an order under section 263.403, "the court shall . . . schedule a new date, not later than the 180th day after the date the temporary order is rendered, for dismissal of the suit unless a trial on the merits has commenced." *Id.* at (b).

## B. Analysis

The record reflects that the trial court rendered a temporary order appointing the Department as temporary managing conservator on February 7, 2014, and set the dismissal date on February 9, 2015. It is undisputed that a bench trial commenced on January 15, 2015, within the initial one-year dismissal period under section 263.401(a). The record further shows that the case was continued on February 5, 2015, June 18, 2015, and August 27, 2015, following which the trial court signed a monitored return order on September 18, 2015. On January 20, 2016, the Department filed an emergency petition to modify the temporary order seeking termination of C.B.'s parental rights to the children. The trial resumed on April 14 until the close of evidence on April 16, 2016. The trial court entered its termination order on May 16, 2016.

C.B. argues that section 263.403 makes no mention of continuing a trial after a failed monitored return. Instead, she asserts that the statute's language stating "[i]f a child placed with a parent under this section must be moved from that home by the department before the dismissal of the suit or the commencement of the trial on the merits" means that the trial court was required to start a new trial on the merits. We find no such requirement in the statute. After the children were removed following the failed monitored return, the trial court resumed proceedings on April 14, 2016, stating, "All right. Back on the record in 75684, Baldridge/Mack, continuing on the final trial." We are aware of no authority for the proposition that a trial court is required to begin a new, separate trial in the event a monitored return fails. To the contrary, section 263.403 specifically allows a trial court to retain its jurisdiction and continue the proceedings. *See id.* §263.403.

C.B. also complains that the trial court should have been limited to considering the evidence presented during proceedings on April 14 and 15, 2016. C.B. did not object to the trial court's consideration of evidence admitted prior to the entry of the monitored return order. Having failed to do so, she did not preserve this complaint for our review. *See* TEX. R. APP. P. 33.1; *Rogers v. Dep't of Family & Protective Servs.*, 175 S.W.3d 370, 377 (Tex. App.—Houston [1st Dist.] 2005, no pet.). We overrule C.B.'s first issue.

15

**Predicate Termination Findings Under Section 161.001(b)(1)**

In her second and third issues, C.B. contends that the evidence is legally and factually insufficient to support the trial court's termination findings under sections 161.001(b)(1)(D) and (E).

**A. Burden of Proof and Standard of Review**

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In a case to terminate parental rights under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2016). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm

belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2016); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d at 362.

In a legal sufficiency review in a parental rights termination case, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, disregarding all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id.*

When conducting a factual sufficiency review, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

17

**B. Analysis**

The trial court found the evidence sufficient to support termination of C.B.'s parental rights to J.L.M., K.A.S, A.L.S, and B.B.S. under two predicate grounds: subsections (D) and (E) of section 161.001(b)(1). Section 161.001(b)(1) provides, in relevant part, that the trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence, in addition to the best interest finding, that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; . . . .

TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) (West Supp. 2016). Endangerment means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.P.*, ___ S.W.3d ___, 2016 WL 3023987, at \*10 (Tex. App.—Houston [1st Dist.] May 26, 2016, pet. denied).

Under subsection (E), the evidence must demonstrate that the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re S.R.*, 452 S.W.3d 352, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection (E) must be based on more than a single act or

omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

"Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re S.R.*, 452 S.W.3d at 361 (citing *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *Sylvia M. v. Dallas Cty. Welfare Unit*, 771 S.W.2d 198, 201, 204 (Tex. App.—Dallas 1989, no writ) (considering "volatile and chaotic" marriage, altercation during pregnancy, and mother's repeated reconciliation with abusive spouse). The record reflects that when the Department began its initial investigation

19

in March 2013, J.L.M., who had belt marks on the back and front of her legs, reported seeing Wiley, C.B.'s live-in boyfriend, dragging C.B. by her feet resulting in a domestic disturbance call to police. In October 2013, C.B. and Wiley were arrested for assault. In January 2014, the Department learned from police that C.B. and Wiley were involved in a family violence altercation in which C.B. sustained visible injuries to her face, and that K.A.S. was present at the time. The court also heard testimony that Wiley was living in C.B.'s home after the children were returned to C.B. under the monitored return. *See J. C.-O. v. Tex. Dep't of Family & Protective Servs.*, No. 03-16-00271-CV, 2016 WL 6068263, at *7 (Tex. App.—Austin Oct. 14, 2016) (mem. op.) (concluding father's continued relationship with mother, which was admittedly abusive, raised doubt about his ability to be protective parent to daughter).

The evidence also shows during two supervised family visits with her children in February and March 2015, C.B. screamed and cursed at McNair, visibly upsetting her children, and that police were called to intervene on both occasions. McNair also testified that C.B. threatened and was verbally abusive to her therapists and Department workers on numerous occasions, as well as to one of the children's foster parents on another occasion. *In Interest of E.W.*, No. 14-14-00751-CV, 2015 WL 556399, at *6 (Tex. App.—Houston [14th Dist.] Feb. 10, 2015, no pet.) (considering evidence of mother's angry behavior with Department caseworkers, screaming

20

arguments with her domestic partner, cursing at court hearing, and angry outburst after court proceeding, as supporting endangerment finding).

The court also heard evidence that, in January 2016, C.B. called J.L.M. and threatened to kill her if she did not report alleged sexual abuse of one of the twins. When McNair attempted to talk to C.B. about J.L.M.'s statement, C.B. threw her cell phone at McNair's head, spat on her, and shoved her.

A parent's efforts to improve or enhance parenting skills are also relevant in determining whether a parent's conduct results in endangerment under subsection E. *See In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied). Failure to maintain stability endangers the child's physical and emotional well-being. *See In re A.B.*, 412 S.W.3d at 599. The Department testified about their concerns that C.B. was not abiding by the court-ordered service plan. The record reflects that C.B. failed to complete court-ordered therapy to address the issue of domestic violence; she regularly moved between three counties while her children resided with multiple caregivers and, in doing so, failed to provide a stable home throughout the pendency of the case; and she was arrested during the period of the monitored return necessitating intervention by the Department to ensure that the children were picked up at the jail and remained safe until her return home. "A parent who lacks stability, income, and a home is unable to provide for a child's

emotional and physical needs." *In re C.A.C.*, No. 14-12-00396-CV, 2012 WL 4465234, at *12 (Tex. App.—Houston [14th Dist.] Sept. 27, 2012, no pet.).

The record also reflects that C.B was arrested in 2013 for assault and again in 2015 for outstanding warrants; in both cases, C.B. was jailed and released the next day. In addition, evidence was admitted at trial showing that C.B. was convicted eight times between 2005 and 2010 for various offenses including criminal trespass, theft, and resisting arrest. Evidence of criminal conduct, convictions, and imprisonment and the effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.).

Taking all of this evidence into account, the trial court could have considered the domestic violence between C.B. and Wiley and Wiley's continued presence in C.B.'s life, C.B.'s volatility, repeated verbally abusive behavior toward Department caseworkers and her therapists, as well as her physically assaultive behavior toward McNair, C.B.'s threat to J.L.M. that she would kill her, C.B.'s criminal history, and her inability to provide a stable home for the children as evidence that C.B. engaged in a course of conduct that endangered her children. Although C.B. denied that she was still in a relationship with Wiley or that she threatened J.L.M., the trial court was entitled to believe or disbelieve her testimony. *See In re E.W.*, 2015 WL 556399, at *7.

22

Reviewing all the evidence in the light most favorable to the endangerment findings, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the termination findings under section 161.001(b)(1)(E). In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the endangerment finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of the termination finding under that subsection. *See In re H.R.M.*, 209 S.W.3d at 108. Accordingly, the evidence is both legally and factually sufficient to support the termination findings under Family Code Section 161.001(b)(1)(E).[5] We overrule C.B.'s third issue.

## Best Interest of the Child

In her fourth issue, C.B. argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest.

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116

---

[5] Having determined that the evidence is sufficient to support the trial court's finding on this statutory ground, we need not consider whether the evidence would support subsection (D), the other predicate ground for termination challenged in C.B.'s second issue. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (affirming termination decree based on one predicate without reaching second predicate found by trier of fact and challenged by parent).

(Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all of the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Moreover, we note that evidence supporting termination under one of the grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child.

*See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (holding same evidence may be probative of both section 161.001 grounds and best interest).

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. *See* TEX. FAM. CODE ANN. § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

## A. Children's Desires and Needs

McNair testified that the children have an unhealthy fear of C.B. due to C.B.'s violent outbursts and volatility, and that K.A.S. asked her to take him back to foster care and had tried to run away three times after being returned to C.B. under the monitored return order. There was also evidence that, at the time the case began, J.L.M. was missing school twice a week.

McNair testified that J.L.M.'s paternal grandmother with whom she is currently placed is providing a very stable environment for J.L.M. and that J.L.M. is doing well in school. She further testified that A.L.S., B.B.S., and K.A.S. are doing very well in their foster placements where their physical, emotional, and educational needs are being met. *See In re C.H.*, 89 S.W.3d at 28 (evidence about present and future placement of child is relevant to best interest determination). This evidence supports the trial court's best interest finding under the first and second *Holley* factors.

## B. Endangering Conduct, Including Domestic Violence, Volatility, and Criminal History

A parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). A parent's abusive or endangering conduct may be considered in a best interest analysis even when it occurred before the child's birth. *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The trial court heard testimony about C.B.'s domestic abuse history in her children's presence and of C.B.'s continuing relationship with Wiley. The Department presented evidence that C.B. exhibited frequent violent outbursts toward Department caseworkers, at times in front of her children, verbally abused her therapists, and verbally and physically assaulted McNair. J.L.M. told McNair that C.B. threatened to kill her days before she was scheduled to return home. The trial

court also had before it evidence of C.B.'s criminal history, including an arrest in 2013 for assault and again in 2015 for outstanding warrants, and numerous convictions between 2005 and 2010.

The evidence of C.B.'s continued endangering conduct supports the trial court's best interest finding. *See In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *7 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (concluding father's series of crimes, including drug-related offenses and domestic violence occurring before and after children's births, supported trial court's best interest finding); *In re J.I.T.P.*, 99 S.W.3d at 846 (stating domestic violence, even when child is not intended victim, supports finding that termination is in child's best interest). This evidence supports the trial court's best interest finding under the third *Holley* factor.

### C. Parenting Abilities, Acts or Omissions of the Parent, and Stability of the Home or Proposed Placement

The fourth *Holley* factor considers the parenting abilities of the parent seeking custody, the seventh factor considers the stability of the home, and the eighth factor considers the acts or omissions of the parent which may indicate the existing parent-child relationship is improper. The evidence shows that C.B. attended numerous supervised visits with her children during the pendency of the case. It also showed that during two supervised family visits, C.B. screamed and cursed at McNair and police were called to intervene on both occasions, and that C.B.

27

threatened and was verbally abusive to Department workers during supervised visits with her children. J.L.M.'s school also reported that J.L.M. was missing as many as two days of school every week. There was also evidence that C.B. threatened to kill J.L.M., and that she left a voice mail message for McNair in which she coached K.A.S. to say that McNair told him to run away from C.B. and into the middle of road so that he could get run over and killed, and that K.A.S. could be heard crying on the recording. C.B. also testified that she had difficulty with J.L.M. during overnight visitations because J.L.M., who was eleven years old at the time, would not abide by her 11:00 p.m. curfew and that C.B. called the police for assistance. Although C.B. testified that her family had a three-bedroom house in which she and the children could live rent-free if they returned, there was also evidence that C.B. regularly moved between three counties while her children resided with multiple caregivers throughout the pendency of the case. This evidence supports the trial court's best interest finding under the third, seventh, and eighth *Holley* factors.

Viewing all the evidence in the light most favorable to the judgment, we conclude that a fact finder could have formed a firm belief or conviction that termination of C.B.'s parental rights is in her children's best interest. *See J.F.C.*, 96 S.W.3d at 265–66. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the best interest finding is not so significant that a fact finder could not reasonably have formed a firm belief

or conviction that termination of C.B.'s parental rights is in her children's best interest. *See In re H.R.M.*, 209 S.W.3d at 108. After considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the best interest of J.L.M., K.A.S., A.L.S., and B.B.S. Accordingly, we overrule C.B.'s fourth issue.

## Conclusion

We affirm the trial court's judgment.

Russell Lloyd
Justice

Panel consists of Justices Bland, Massengale, and Lloyd.